**FILED**
**MARCH 16, 2017**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32228-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL CHRISTOPHER LAZCANO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Daniel Lazcano appeals his conviction for first degree murder on numerous grounds: (1) the trial court abused its discretion when it refused to accept a plea agreement to second degree manslaughter, (2) the trial court erred when it excused an impaneled juror for financial hardship, (3) the prosecutor engaged in improper vouching when he elicited evidence from the State's witnesses that those witnesses promised to testify truthfully in exchange for immunity or favorable plea agreements, (4) cumulative error deprived him of a fair trial, and (5) insufficient evidence supports his conviction because the State relied on alternative means and failed to prove both means beyond a reasonable doubt. Lazcano also contends the trial court erred when, as part of his sentence, it required him to register as a felony firearm offender. Lazcano further

filed a lengthy statement of additional grounds for review. We affirm Lazcano's

conviction for first degree murder and the sentence requirement of registration. The

numerous assignments of error and statements of additional grounds prolong this opinion.

FACTS

The prosecution of Daniel Lazcano arises from the death of Marcus Schur on

December 27, 2011, in rural Whitman County. This court previously reviewed the

conviction of Daniel Lazcano's brother, Frank, for the same homicide. *State v. Lazcano*,

188 Wn. App. 338, 354 P.3d 233 (2015), *review denied*, 185 Wn.2d 1008, 366 P.3d 1245

(2016). Because the evidence entered in the respective trials varied, we begin anew with

the facts surrounding the death of Schur.

In mid-December 2011, a burglar entered Ben Evensen's Rosalia house. Rosalia,

an agricultural community of 500 denizens, lies immediately south of the Whitman and

Spokane Counties border and thirty-three miles south of the City of Spokane. Defendant

Daniel Lazcano, Evensen's roommate, concluded that the burglar stole some of

Lazcano's possessions, including two of his firearms. Lazcano and his brother, Frank,

suspected Marcus Schur to be the thief. Because of the pilfering, Frank lent Daniel the

former's AK-47 rifle, a firearm previously used by Daniel.

Because they suspected Marcus Schur as the burglar, Daniel and Frank Lazcano

visited Schur's girlfriend, Ambrosia "Amber" Jones. Daniel expressed to Jones his

2

displeasure with the theft in part because the stolen firearms held sentimental value.

Frank promised to kill Schur if found. Jones relayed Daniel and Frank Lazcano's

comments to Marcus Schur. Schur returned Lazcano's firearms by placing them in Ben

Evensen's backyard with no one else present.

Despite the reappearance of his firearms, Daniel Lazcano remained incensed at

Marcus Schur because Lazcano believed Schur retained other possessions of Lazcano.

Lazcano told Ben Evensen's mother, Susan Consiglio, that Frank and he would confront

Schur when located. Consiglio worried about violence and discouraged Lazcano from

encountering Schur. At a later date and while inside an automobile, the Lazcano brothers

spoke again to Consiglio and informed her they were going to Spokane to find Schur,

who they believed dwelled with friends in a trailer park. Consiglio noticed an AK-47

rifle resting in the car between the brothers.

On December 27, 2011, Susan Consiglio notified Daniel Lazcano, then in

Spokane, of the presence of Marcus Schur in Malden, a small village five miles west of

Rosalia. Lazcano called his friend Kyle Evans and asked Evans if he wished to "whup

Marcus's ass." Report of Proceedings (RP) (Dec. 3, 2013) at 412. Evans declined

because of his busy calendar.

After calling Kyle Evans, Daniel Lazcano and his girlfriend, McKyndree Rogers,

drove from Spokane to the house of Lazcano's uncle, Travis Carlon, who lived in Pine

3

City, a rural community three miles southwest of Malden. Daniel Lazcano and Rogers joined Frank Lazcano and his girlfriend, Jamie Whitney, at the Carlon residence. Frank watched football and first eschewed accompanying Lazcano in a pursuit of Marcus Schur. Lazcano eventually convinced Frank to escort him. The brothers left Pine City in Lazcano's little white car, owned by his stepfather, Eli Lindsey.

Daniel and Frank Lazcano arrived at Nick Backman's Malden home, where Marcus Schur, David Cramer, Ambrosia Jones, and Backman were present. Cramer and Schur were brothers. Frank exited the car, while Daniel drove to the back of the house. Frank approached and knocked on the home's front door. Schur, hearing the knock, exited the home's back door. Cramer opened the front door. Frank struck Cramer several times in the face, and Cramer staggered to the ground. Frank ran toward Ambrosia Jones, flung her across the living room, and broke her hand. Frank rushed through the kitchen and departed through the back door.

As Marcus Schur fled through the backyard, Daniel Lazcano waited with a gun. Lazcano yelled, "'Stop, Marcus,'" and then opened fire. RP (Dec. 9, 2013) at 980. Two bullets struck Schur. One bullet lacerated an artery under Schur's collarbone and then collapsed his left lung. Schur quickly bled to death.

Daniel and Frank Lazcano deposited Marcus Schur's body in the trunk of the white car. Ambrosia Jones peered outside a window from Nick Backman's residence and

4

saw a white car that she knew to be Daniel Lazcano's vehicle. She thought, but could not be sure, she saw Lazcano inside the car. She did not see Schur's dead body.

The brothers Lazcano drove from Nick Backman's residence to Travis Carlon's Pine City house. Frank entered the abode, while Daniel sat in the passenger's seat of the car. Frank hurriedly exclaimed to Carlon: "We got one in the car with two in the chest." RP (Dec. 4, 2013) at 513. Carlon and Frank exited the house. Carlon deduced that Daniel and Frank Lazcano had killed Marcus Schur. Carlon told the brothers not to discuss the slaying at his house because he expected the soon arrival of law enforcement officers. Carlon directed the two brothers to meet him outside Pine City. Frank Lazcano led the way in Daniel's white car, and Carlon followed in his own vehicle.

Miles into the rolling Palouse hills, Frank Lazcano and Travis Carlon stopped their respective cars. Frank suggested the three use cinder blocks, stored in his garage, to dispose of Marcus Schur's body. Carlon agreed and declared: "[I]f there's no body found, then there wouldn't be a crime." RP (Dec. 4, 2013) at 520. Frank Lazcano remained at the stopping spot, while Carlon and Daniel Lazcano drove to Pine City to retrieve the cinder blocks. On the drive, Daniel Lazcano repeatedly confessed: "Uncle, I fucked up." RP (Dec. 4, 2013) at 524. For some unknown reason, Carlon and Lazcano reversed plans, decided not to retrieve Frank's blocks, and returned to Frank's position.

5

Upon the reunion of the three, Frank Lazcano recommended hiding Marcus Schur's corpse in Bonnie Lake, ten miles northwest of Pine City. Frank requested that Travis Carlon take possession of Frank's AK-47. Carlon opened his trunk, and Frank planted his rifle inside. The brothers Lazcano separated from Carlon, with the brothers journeying toward Bonnie Lake and Carlon returning home to Pine City. Carlon stopped on the way, took Frank's AK-47 from his trunk, and hid the firearm behind a fence post.

When Travis Carlon arrived home, he telephoned Eli Lindsey, Daniel and Frank Lazcano's stepfather, and instructed Lindsey to come to Carlon's residence. Lindsey obeyed. The two then drove in Lindsey's truck to the location where Carlon secreted the AK-47. Carlon plunked the AK-47 in the truck. The two drove to the T.J. Meenach Bridge in Spokane, where Carlon flung the rifle into the Spokane River. A Spokane Sheriff's Department dive team later discovered the firearm.

Meanwhile back in the pastoral Palouse, Daniel and Frank Lazcano reached Bonnie Lake. The two exited the white car and removed Marcus Schur's dead body from the car's trunk. The brothers dragged the cadaver by the legs to the water's edge. They bound Schur's hands with a belt and his feet with a shirt. Daniel Lazcano gathered rocks. Frank placed the rocks on the corpse and submerged the body below water level.

Late on December 27, 2011, Frank Lazcano drove the white car, with girlfriend Jamie Whitney accompanying him in a second car, to Spokane County. In a rural area

6

north of the city of Spokane, Frank ignited the car. Whitney drove the two back to Pine City. The fire department and law enforcement responded to the fire. Police read the vehicle identification number on the car and traced the charred vehicle's ownership to Eli Lindsey.

In March 2012, a hiker sighted Marcus Schur's body in Bonnie Lake. Jamie Whitney, Ben Evensen, Daniel Lazcano, and Frank Lazcano, all fearful of the body's discovery, convened a meeting. Daniel volunteered to assume the blame since Daniel shot Schur. Frank offered to take the blame because the police only knew of Frank being present at Nick Backman's home on December 27. During the conference, Daniel explained to Evensen that Daniel shot Schur. During the explanation, Daniel raised his arms and pantomimed firing a rifle.

At an unidentified time, a police officer questioned Jamie Whitney, Frank Lazcano's girlfriend. Whitney told the officer that, on the night of the murder, she retrieved Frank along a highway because Frank's vehicle malfunctioned. Travis Carlon had advised Whitney to tell this story to the police. A law enforcement officer also questioned McKyndree Rogers, Daniel Lazcano's girlfriend. Rogers informed the police that she and Daniel socialized on the night of the murder. Daniel and Frank Lazcano respectively reported matching accounts to police of their activities on December 27 and 28. The two explained that Daniel spent the evening with McKyndree Rogers in

7

Spokane, Frank traveled alone to the Backman house in Malden, and the white car failed at a grocery store in Spokane.

Law enforcement arrested Daniel Lazcano on March 30, 2012. At the sheriff's station, Lazcano was advised of his *Miranda* rights, and Lazcano replied that he did not wish to answer any questions. Undersheriff Ronald Rockness then asked fifteen questions to Lazcano outlining what the undersheriff believed occurred. Undersheriff Rockness asked Lazcano if Lazcano went to the Backman house, if Frank ran in the front door, if Marcus Schur ran out the back door, if Lazcano shot Schur, and if Lazcano loaded Schur's body into his car. After asking each question, Rockness paused and looked at Lazcano for a response. Lazcano nodded in response to a number of incriminating questions.

In a separate prosecution, a jury found Frank Lazcano guilty of first degree felony murder. The State granted Eli Lindsey, Jamie Whitney, Ben Evensen, and McKyndree Rogers favorable plea or immunity agreements in exchange for cooperation in the prosecution of Daniel Lazcano.

## PROCEDURE

The State of Washington charged Daniel Lazcano with first degree murder and unlawful disposal of human remains. The State alleged Lazcano to be guilty of first degree murder by the alternate means of premeditation and felony murder.

8

At the end of Daniel Lazcano's first trial, a Whitman County jury convicted him of unlawful disposal of human remains, but could not reach a verdict as to the first degree murder charge. Lazcano does not appeal his conviction for unlawful disposal. The State tried the first degree murder charge again, but a second Whitman County jury could also not reach a verdict.

Following the second mistrial, the State and Daniel Lazcano reached a plea agreement, under which Lazcano would plead guilty to second degree manslaughter with no weapons enhancement and the State would recommend a standard range sentence of between twenty-one and twenty-seven months. At the entry of the plea hearing, July 19, 2013, Lazcano handed the trial court a statement of plea on guilty to second degree manslaughter signed by all the parties, and the State presented an amended information charging second degree manslaughter. Grace Schur, Marcus Schur's mother, attended the plea hearing and voiced opposition to the plea agreement. Grace Schur emphasized Frank Lazcano's testimony that Daniel shot her son, and she criticized two years' incarceration as sufficiently meting punishment for the crime.

At the conclusion of the plea hearing, the trial court rejected the plea agreement and the proposed amended information charging Daniel Lazcano with second degree manslaughter. The court acknowledged that the first two trials inconvenienced twenty to thirty witnesses and hundreds of veniremen and women. The court anticipated and

9

lamented a lengthy, expensive third trial. The trial court also valued finality and closure in the prosecution. Nevertheless, the trial court refused to accept the plea agreement on the basis alone of the weariness of attorneys, witnesses, and family members of the victim. The court desired a plea agreement to be consistent with prosecutorial standards and the interests of justice. The trial court emphasized the deceit, prevarication, and interference with the administration of justice by Daniel Lazcano and his family members. The court noted that the State's evidentiary difficulties surrounding a conviction resulted from the dishonesty and manipulation by Lazcano, family members, and friends. Any acceptance of a plea on lesser charges would reward perjured testimony and manipulation.

When rejecting the plea agreement, the trial court also noted that Frank Lazcano, who was not the shooter, received a twenty-five year sentence. Daniel Lazcano's plea agreement afforded the shooter a twenty-seven month sentence. The court commented that he might accept another plea agreement, but the agreement before him impugned the integrity of the legal system.

The State of Washington filed a third amended information charging Daniel Lazcano with first degree murder and adding a firearm enhancement. The Whitman County trial court granted a motion to change venue. Trial proceeded in Spokane County Superior Court before a Spokane County judge. Before jury selection started, Daniel

Lazcano moved to enforce the prior plea agreement or allow the amended information charging second degree manslaughter. The new trial court denied Lazcano's motion.

Before trial, Daniel Lazcano astutely moved to suppress all of his nonverbal responses to Undersheriff Ronald Rockness's questions about the circumstances of the homicide. The trial court ruled that, with the exception of the first question, the questioning violated the Fifth Amendment and ruled that Lazcano's nonverbal responses to Undersheriff Rockness's questions were inadmissible in the State's case in chief. The trial court qualified its ruling by stating that nods were admissible for the limited purpose of impeachment if Lazcano testified.

During voir dire in the third trial, the trial court asked the venire jurors if serving on the jury for three weeks would create a significant hardship. Juror 29 answered in the affirmative because he needed to work and pay bills. The juror added that he could not pay current debts on juror remuneration of $12 per day. The trial court did not then address juror 29's concern.

After the trial court impaneled the jury but before opening statements, the trial court addressed a concern raised by juror 2. Juror 2 stated that his employer asked for him to be excused. The trial court summoned juror 2 into the courtroom and conducted a colloquy. Juror 2 declared that his employer did not pay him for jury duty, he was moving, he had a vehicle payment, and he could not miss three weeks of pay around

11

Christmas. Daniel Lazcano objected to excusing juror 2 because excusal would preclude working class people from jury duty. Lazcano suggested paying juror 2 a reasonable daily wage. The trial court excused juror 2 on the ground of hardship. The trial court replaced juror 2 with the first alternate juror.

During opening arguments, defense counsel argued that Ben Evensen, a witness for the State, was not credible:

> Ben Evensen, their jailhouse snitch who made a deal to get out of jail who agreed to testify to what they told him he has to testify to in order to get his deal, made a statement. And their whole case revolves around this, because there's nobody puts Daniel at that—at that scene. There's nobody puts him there.
> . . . The problem is, is he also says Daniel confessed to a bunch of things that we're going to show you didn't happen. And we're going to show you all kinds of independent witnesses giving you information that absolutely contradicts that, absolutely contradicts that.
> First off, we're going to prove to you beyond a scientific certainty that the murder weapon wasn't the AK-47. . . . And yet the state bases their whole case on this. Why? Because that's what they got Ben Evensen to say Daniel confessed to. They have no choice.

RP (Dec. 3, 2013) at 319-20.

During a recess early in the trial, the prosecutor informed the trial court, in the presence of defense counsel and Daniel Lazcano, that, while in the hallway chatting with a witness, the replacement juror 2 approached him and asked, "'Could I ask you a question?'" RP (Dec. 3, 2013) at 335. The prosecutor replied no to the juror and walked from the juror. The bailiff then informed the trial court, in the presence of counsel and

12

Daniel Lazcano, that juror 2, who the bailiff identified by name, started discussing the case in the jury room with two other jurors present and asked the bailiff if he could ask counsel a question. The bailiff stated he admonished the juror to not discuss the case in the jury room and to wait until deliberations.

After the prosecutor and the bailiff disclosed the conduct of juror 2, the trial court asked counsel if either wanted any steps taken. Defense counsel stated, "I think we should probably inquire as to—I don't know, Judge." Clerk's Papers (CP) at 338. The trial court announced it would repeat its instructions to the jury not to talk to counsel or witnesses and not to loiter in the hall. Defense counsel agreed that the trial court's proposed action was an appropriate solution. The jury returned, and the trial court reminded the jurors not to talk to or approach the lawyers, the witnesses, or the court. The trial court also reminded the jurors not to linger in the hallway and not to discuss the case amongst themselves until deliberations. The trial court asked the jurors if they understood, and the jurors nodded their heads.

During trial, the prosecutor elicited testimony from Eli Lindsey, Jamie Whitney, Ben Evensen, and McKyndree Rogers. The testimony included their respective promises to testify truthfully at trial in exchange for a plea or immunity agreement.

During direct examination, the State proffered exhibit 88, a letter from the prosecutor to Ben Evensen's attorney that summarized Evensen's plea agreement. The

trial court admitted the letter as an exhibit. The letter stated that, in exchange for a favorable plea agreement, Evensen agreed to "testify truthfully in any case related to the murder of Marcus Schur." Br. of Appellant at 30. The prosecutor asked Evensen several times whether the agreement required him to be truthful in his testimony, and Evensen agreed. The prosecutor also directly asked Evensen if he told the truth, and Evensen said he did.

During direct examination, the State proffered exhibit 89, a letter from the prosecutor to Eli Lindsey's attorney that summarized Lindsey's plea agreement. The trial court admitted the letter as an exhibit. The letter read that the State extended Lindsey a favorable plea agreement in exchange for Lindsey "testifying truthfully if subpoenaed to do so at any hearing or trial." Br. of Appellant, Appx. F. During the State's case in chief, the prosecutor asked Lindsey if he had agreed to give "a full complete, and truthful statement about what [he] knew," in exchange for a favorable plea offer, and Lindsey agreed he had. RP (Dec. 4, 2013) at 609. Lazcano did not object.

During direct examination, the State proffered exhibit 86, a letter from the prosecutor to McKyndree Rogers's attorney granting Rogers immunity. The prosecutor asked Rogers if the exhibit contained an agreement that she would not be prosecuted "in exchange for [her] truthful testimony." RP (Dec. 5, 2013) at 812. Rogers agreed. The prosecutor then asked: "the first condition here is that that statement had been truthful?"

14

and Rogers again agreed. RP (Dec. 5, 2013) at 812. The trial court admitted the letter as an exhibit. A portion of the letter read that Rogers agreed to "testify truthfully in any and all trials related to the murder of Mr. Schur." Br. of Appellant, Appx. H. Lazcano did not object.

During direct, the State also proffered exhibit 87, a letter from the prosecutor to Jamie Whitney's attorney granting Whitney immunity. The prosecutor asked Whitney if she understood that she received immunity in exchange for her truthful statement and her agreement to "appear in response to a subpoena and testify truthfully." RP (Dec. 5, 2013) at 869. Whitney agreed. The trial court admitted the letter, which stated that Whitney agreed to "testify truthfully in any and all trials related to the murder of Mr. Schur." Br. of Appellant, Appx. G. Lazcano did not object.

On direct examination, uncle Travis Carlon testified that Frank Lazcano lay the AK-47 in his trunk, but then Carlon denied that either brother told him that they used the AK-47 to shoot Marcus Schur. The prosecution then asked Carlon about a statement he previously gave Undersheriff Ronald Rockness, in which he told Rockness that the Lazcano brothers told him they used an AK-47.

Before Travis Carlon's testimony, Daniel Lazcano asked the trial court to preclude testimony from Carlon that he believed Lazcano committed the murder and that Carlon told his wife and Jamie Whitney that Lazcano committed the murder. The trial court

15

granted Lazcano's motion in limine. During direct examination, the prosecutor asked

Travis Carlon if he told his wife that Lazcano shot Marcus Schur and if he had told Eli

Lindsey that Lazcano shot Schur. Lazcano objected both times on grounds of relevance,

and the trial court sustained the objections. During trial testimony, Travis Carlon

described how he drove with the brothers into the country to hide Marcus Schur's body,

how Daniel repeatedly uttered in the car, "'Uncle, I fucked up,'" and how Carlon

assumed Lazcano killed Schur. RP (Dec. 4, 2013) at 524, 538.

During trial, Nicole Carlon testified that Daniel Lazcano told her that, after the

shooting, he looked for bullet shells from the AK-47. According to Carlon, Lazcano told

her he could not find the shell casings, that the casings had flung "pretty far, like they

were gone." RP (Dec. 16, 2013) at 1876.

The State called as a witness, James Holdren, the Lazcano brothers' uncle. Before

Holdren's testimony, the State brought a motion in limine to preclude Daniel Lazcano

from questioning Holdren about mental health problems and a previous commitment to

Eastern State Hospital. The State argued that James Holdren's mental problems were

irrelevant and unduly prejudicial. Lazcano resisted the motion. The trial court ruled that

Daniel Lazcano could not examine Holdren about his psychiatric episodes because of the

lack of relevance. The trial court expressed concern that Lazcano wanted to make

Holdren appear incompetent so the jury would think Holdren committed the murder. The

16

court, however, allowed Lazcano to ask Holdren about relevant acts, such as his phone call to a police officer in which he expressed a belief of planted ammunition in his vehicle. Lazcano cross-examined Holdren extensively about this call.

During direct examination, James Holdren testified that he saw his nephews on Christmas 2011, four days before the murder, and then did not see them again until March 2012. Daniel Lazcano testified in the first two trials that he exited the white car before the murder and Holdren took his place in the car. The State used Holdren's testimony to rebut Lazcano, in the event Lazcano testified as he did in earlier trials.

The State called expert witness Dr. Jeffrey Reynolds to testify regarding the autopsy he performed on Marcus Schur's body after its recovery from the lake. The State extensively questioned Reynolds regarding his education, training, and experience in engineering and medicine. The State then asked questions concerning the details of the autopsy. Reynolds' testimony covered conclusions on the size of the bullet that caused Schur's wounds, bullet velocity, and the ballistics of a bullet as it travels through the body. Reynolds concluded that a supersonic round caused the wounds in Schur's body. A supersonic bullet travels faster than the speed of sound. A rifle, but not a handgun, shoots supersonic rounds. Reynolds further testified that an AK-47 fires supersonic rounds. Lazcano did not object during any of the testimony.

Daniel Lazcano also called as a witness a ballistics expert who testified that the

17

wounds in Marcus Schur's body could not have been caused by an AK-47. After the defense rested, the State requested to recall Jeffrey Reynolds to rebut the defense expert's testimony. Lazcano objected on the ground that Reynolds's testimony would repeat his earlier testimony, and, therefore, any testimony would be cumulative. The trial court reserved ruling and stated it would listen to Lazcano's objection if Reynolds's testimony was unnecessarily repetitive.

During his autopsy of Marcus Schur's corpse, Jeffrey Reynolds recovered some bullet fragments, but decided not to look for the remainder of the original bullet because the remaining fragmentation would not be testable. The State called a second ballistics expert, Glen Davis, an employee of the state crime laboratory, who examined bullet fragments recovered by Reynolds from the corpse during the autopsy. Davis opined that the bullet bits were consistent with the size rounds fired by the AK-47.

The State did not proffer any evidence, during its case in chief, concerning Daniel Lazcano's sheriff interview. Lazcano opted to testify. During cross-examination, the prosecutor asked Lazcano the majority of the questions Undersheriff Ronald Rockness asked Lazcano during his postarrest interview. The prosecutor did not mention that Rockness asked the same questions during the interview. After the defense rested, the State called Rockness and had him recite all of the questions he had asked Lazcano in the station interview, along with Lazcano's reaction.

The trial court instructed the jury on two alternative means of first degree murder. The trial court instructed that the jury could find that Daniel Lazcano committed premeditated murder or find that he shot Marcus Schur "in the course of or in furtherance of such crime of" first degree burglary "or in immediate flight from" the burglary. CP at 311. In a jury instruction, the court declared that a person commits the crime of first degree burglary when he enters or remains unlawfully in a building with the intent to commit a crime against a person or property, and if, in entering or while in the building or in immediate flight therefrom, he or an accomplice is armed with a deadly weapon or assaults any person. The court further instructed the jury that it need not be unanimous as to which of the alternatives the State proved as long as each juror found that the State proved at least one of the alternatives beyond a reasonable doubt. Finally, the trial court delivered a general accomplice liability instruction.

During the jury instruction conference, the prosecutor inquired about a limiting instruction that would instruct the jury to only consider Undersheriff Ronald Rockness' descriptions of Daniel Lazcano's postarrest head nods for purposes of impeachment and not as substantive evidence. The court responded that a limiting instruction would draw excessive attention to the testimony, and defense counsel agreed.

In closing argument, the prosecutor remarked:

> Why is it that when the defendant nods, that that is after the statements that are true, that we know now are true, and he doesn't nod when the officer said something that we know is not true? Let's talk about those statements.

RP (Dec. 17, 2013) at 1982. The prosecutor then listed all fifteen questions that

Undersheriff Ronald Rockness asked Daniel Lazcano in the interview and described

Lazcano's response. After finishing the list of questions, the prosecutor stated:

> Why does he nod only on the things that we know to be true and does not nod on the things that we know are not true? Coincidence? Mm.

RP (Dec. 17, 2013) at 1984. Lazcano did not object to the prosecutor's remarks.

During closing argument, the prosecutor declared:

> And we have the testimony of Ben Evensen on February the 12th and 13th. . . . [W]e have the testimony of Ben Evensen on February the 27th . . . . [W]e have the testimony of Ben Evensen on May 31st and June the 3rd . . . And every single time, he has told the truth. I forgot: a recorded interview of Ben Evensen . . . on July the 30th of 2012.
> Every single time, he's told the truth. Every single time, he said, "Marcus told me"—excuse me. He said, "Dan told me he waited out back. 'Marcus ran out and Marcus was running, and I said, *Marcus, stop, stop.* And Marcus wouldn't stop. And so I raised up and I went 'bop-bop-bop.'"

RP (Dec. 17, 2013) at 1980. Lazcano did not object to this argument.

During closing argument, the prosecutor asked the jury to infer that Daniel

Lazcano told Travis Carlon he killed Marcus Schur. Carlon repeatedly testified that he

"assumed" the brothers killed Schur, based on their statements and actions, even though

Carlon declared that the brothers never explicitly confessed. In closing, the prosecutor

20

argued Carlon's denial of an express concession was unbelievable and that Lazcano

probably told Carlon of the details of the murder.

In closing argument, the prosecutor characterized "premeditated" as follows:

> Premeditation, as the Judge told you—and it's in another instruction—premeditation means just more than a moment in time, that's all. It doesn't mean they thought about it for a day or two. It just means more than a moment in time.

RP (Dec. 17, 2013) at 1991.

During closing argument, the prosecutor remarked:

> Defense says the government hasn't proved anything in this case. Like *Alice Through the Looking Glass*, the defense would like to take you to Wonderland, ladies and gentlemen, where down is up and black is white, where the government hasn't proven anything and, my goodness, we don't know what happened. Come back through the looking glass into reality, ladies and gentlemen. Come back. Do not go down that rabbit hole. Come back into the cold, clear light of a December day and examine this evidence.

RP (Dec. 17, 2013) at 2055.

The jury convicted Daniel Lazcano of first degree murder. The jury also returned

a special verdict finding that Lazcano was armed with a firearm when he committed the

crime. In the judgment and sentence, the trial court ordered Lazcano to register as a

felony firearm offender.

LAW AND ANALYSIS

Rejection of Plea Agreement

We begin with Daniel Lazcano's assignment of error that addresses the procedure before his third trial. Lazcano claims the trial court abused its discretion when it refused to accept his plea and the State's proposed amended information reducing charges to second degree manslaughter. The trial court refused to accept the plea because of the best interests of justice. The trial court viewed Lazcano, his family, and friends to be dishonest and manipulative and concluded that approving the plea agreement would promote perjury and manipulation. The trial court did not recall a case with such an extent of deceit. The trial court observed that Lazcano's friends cheered in the courtroom and disrespected the victim's mother.

RCW 9.94A.431 governs the procedure for the State and criminal defendants to submit a plea agreement to the court. The statute declares:

> (1) If a plea agreement has been reached by the prosecutor and the defendant . . ., they shall at the time of the defendant's plea state to the court, on the record, the nature of the agreement and the reasons for the agreement. The prosecutor shall inform the court on the record whether the victim or victims of all crimes against persons, as defined in RCW 9.94A.411, covered by the plea agreement have expressed any objections to or comments on the nature of and reasons for the plea agreement. The court, at the time of the plea, shall determine if the agreement is consistent with the interests of justice and with the prosecuting standards. If the court

22

determines it is not consistent with the interests of justice and with the prosecuting standards, the court shall, on the record, inform the defendant and the prosecutor that they are not bound by the agreement and that the defendant may withdraw the defendant's plea of guilty, if one has been made, and enter a plea of not guilty.

(2) The sentencing judge is not bound by any recommendations contained in an allowed plea agreement and the defendant shall be so informed at the time of plea.

This statute and CrR 4.2 give the trial court discretion to reject a plea agreement inconsistent with the interests of justice or prosecutorial standards. *State v. Conwell*, 141 Wn.2d 901, 909, 10 P.3d 1056 (2000).

CrR 2.1(d) addresses when the State may amend an information. The rule provides:

The court *may* permit any information or bill of particulars to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced.

(Emphasis added.) The court's authority to approve or deny a plea bargain also includes the right to refuse the dismissal or amendment of the charges. *State v. Haner*, 95 Wn.2d 858, 864, 631 P.2d 381 (1981). This court reviews a trial court's ruling on this issue for an abuse of discretion. *State v. Haner*, 95 Wn.2d at 861.

*State v. Haner*, 95 Wn.2d 858, illustrates the discretion afforded the trial court. Gregory Haner, while on probation for a felony offense, engaged in a drunken argument,

grabbed a pistol, pointed the gun toward the victim, and fired. The victim was not seriously injured. The State charged Haner with second degree assault with a deadly weapon and with firearm enhancements. Four days before trial, as part of a plea agreement, the State moved to file an amended information lowering charges to third degree assault and striking the deadly weapon enhancement. During the plea hearing, Haner told the trial court that he accidentally fired the pistol. The State acknowledged difficulties proving the second degree assault charge. The trial court denied the motion to amend the information. The trial court reasoned that, under the facts of the case, Haner either intentionally shot someone while on probation, in which case he deserved a lengthy prison sentence, or Haner accidentally shot the pistol, in which case Haner warranted no prison time. The trial court disapproved of the "in between." *State v. Haner*, 95 Wn.2d at 861.

In *State v. Haner*, our state Supreme Court held that the trial court did not abuse its discretion in concluding that reduction of the charge and dropping of the deadly weapon enhancement would not serve the public interest. The high court observed that Gregory Haner was on probation, was prohibited from carrying a firearm, imbibed large quantities of alcohol, pointed a gun at someone, and fired.

In the case on appeal, the trial court, similar to the trial court in *Haner*, acknowledged its duty to ensure the plea agreement followed prosecutorial standards and

24

furthered the interests of justice. The trial court rejected the plea agreement and the amendment on the basis that the dishonesty and manipulation of Daniel Lazcano, his family members, and friends caused the State's evidentiary problems. The trial court also observed that approving the plea agreement would result in Frank, who was not the shooter, receiving a twenty-five year sentence and Daniel, the shooter, receiving a twenty-seven month sentence. We enthusiastically agree with the trial court's conclusion that justice is not served when a party is rewarded for dishonesty and manipulation. We also ardently concur that justice is not served when an accomplice receives an exponentially higher sentence compared to the shooter. Therefore, the trial court did not abuse its discretion when rejecting the plea agreement and information amendment lowering the charges.

Daniel Lazcano argues that the trial court's extensive knowledge of the earlier trials and pretrial proceedings jaundiced its perception. Nevertheless, Lazcano cites no authority for the proposition that a trial court's extensive knowledge of a case is an illegitimate basis on which to base a decision. The trial court in *Haner* rejected the plea agreement based on its knowledge of the case. *Haner*, 95 Wn.2d at 860-61.

Daniel Lazcano also argues that the trial court's personal beliefs and opinions impermissibly impacted its decision. We question Lazcano's ability to forward this argument. The argument's necessary extension is that the trial court should have recused

itself. Nevertheless, Lazcano did not seek removal of the judge at the trial court level before the trial court's ruling. He first forwarded the argument after a change of venue and assignment of the trial to a Spokane County judge. We do not address arguments not timely raised below. RAP 2.5(a). One cannot wait until after a judge's decision to claim bias against the judge. In any event, the trial court articulated its reasoning based on the facts of the case. The record shows no bias, prejudice, or animus on a personal level against Daniel Lazcano.

Excuse of Juror for Financial Hardship

On appeal, Daniel Lazcano assigns error to the trial court's exclusion of juror 2 on the ground of financial hardship. Lazcano objected to the exclusion below. He laments the legislature's failure to recognize the financial impact of jury service on wage earners. He observes that many counties lack the tax base to provide for adequate payment of jurors particularly when a trial last weeks.

Daniel Lazcano raises statutory and constitutional arguments on appeal. He claims the dismissal of juror 2 violated RCW 2.36.080(3). He contends the exclusion breached his right, under Washington Constitution article I, section 22, to an impartial jury that represents his community. According to Lazcano, excluding working class people deprived him of the opportunity of jurors who understand the daily stresses of living on a marginal income. He presents no case law or literature that establishes that

26

low income jurors will more likely sympathize with criminal defendants. We are unaware of any decision or literature. Daniel Lazcano does not explain how a low wage earner would be more sympathetic to his case. He presents no evidence as to his wealth or lack thereof.

The State answers that Daniel Lazcano cannot show prejudice by the trial court's excluding juror 2. According to the State, the voir dire transcript shows a wide cross section of the community on the jury. Lazcano fails to establish unfitness of the first alternate juror who replaced juror 2. The State contends that a defendant has no constitutional right to a trial by a particular juror and the legislature holds the prerogative to define juror qualifications.

A. Statutory right

We first address Daniel Lazcano's contention that exclusion of juror 2 violated his rights under Washington statute. Jury service is both a duty and a privilege of citizenship. *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 224, 66 S. Ct. 984, 90 L. Ed. 1181 (1946). Broad participation in the justice system is desirable because it reinforces public confidence in the system's fairness. *Balzac v. Porto Rico*, 258 U.S. 298, 310, 42 S. Ct. 343, 66 L. Ed. 627 (1922). Jury service provides individuals with an opportunity to participate in the civic life of our nation. *Powers v. Ohio*, 499 U.S. 400, 407, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). With the exception of voting, for most citizens the

27

honor and privilege of jury duty is their most significant opportunity to participate in the democratic process. *Powers v. Ohio*, 499 U.S. at 407. Discrimination during jury selection undermines these important values. Moreover, discrimination deprives individual defendants of a central right in our system of justice, the right to be judged by a jury of their peers. *Strauder v. West Virginia*, 100 U.S. 303, 308, 25 L. Ed. 664 (1880), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522, 536 n.19, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).

Washington State implements these policies. RCW 2.36.100 governs the process for excusing jurors from service. Subsection one of the statute declares:

> [N]o person may be excused from jury service by the court except upon a showing of undue hardship, extreme inconvenience, public necessity, or any reason deemed sufficient by the court for a period of time the court deems necessary.

Note that the statute does not limit a hardship to a "financial hardship." RCW 2.36.080(3), upon which Daniel Lazcano relies, provides:

> A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin, *or economic status*.

(Emphasis added.)

No Washington case addresses the meaning or application of the term "economic status" within RCW 2.36.080(3). No Washington decision addresses the import of the term in any context. Daniel Lazcano presents no foreign decision that holds the

28

exclusion of one juror for financial hardship violates a similar statute.

*Cerrone v. People*, 900 P.2d 45 (Colo. 1995) has an opposite outcome but illustrates the shortcomings of Daniel Lazcano's legal position. Defendants, on indictment for racketeering, moved to quash the indictment on the ground of discrimination in selection of grand jurors. The court staff employed hourly wage earner status as one factor when impaneling grand jurors because of wage earners' difficulty in consistently attending the grand jury's scheduled sessions. The staff also considered the education level of potential grand jurors so that the jury could understand complex legal cases. The trial court denied the motion and the petit jury convicted the defendants on the charges. The Colorado Supreme Court held that use of the one factor inherently discriminated and violated the mandate of a Colorado statute. The Supreme Court nonetheless affirmed the convictions of the appealing defendants since a separate petit jury convicted the defendants of the crime.

RCW 2.36.080 is based on a state uniform act. The Colorado statute at issue in *Cerrone v. People* read similarly to RCW 2.36.080(3). The Colorado statute declared:

> A citizen shall not be excluded from jury service in this state on
> account of race, color, religion, sex, national origin, or economic status.

*Cerrone v. People*, 900 P.2d at 51 (quoting former section 13-71-103 6A C.R.S. (1987)). Like the Washington statute, the Colorado statute did not define the term "economic

29

status" nor provide guidance on the standard to be used. The court held, however, that the defendants must prove purposeful discrimination because of the statute's use of the words "on account of . . . economic status." This phrasing required affirmative conduct.

The Colorado high court employed an analysis used in constitutional claims in determining whether jury selection violated the Colorado statute. The elements of a prima facie case of purposeful discrimination in jury selection requires the defendant show that (1) the venire in question was selected under a practice providing the opportunity for discrimination, and (2) members of a cognizable group were substantially underrepresented on the venire. Under constitutional analysis, the defendant need not show membership in the same group that is underrepresented on the venire. But the Colorado court rejected this additional requirement for relief under the statute. In determining whether the defendant has established a prima facie case of purposeful discrimination, the trial court must determine whether the totality of the relevant facts gives rise to an inference of discriminatory purpose. Once a defendant has made a prima facie case of discrimination, the state must articulate a nondiscriminatory or neutral reason for its jury selection. At this second step in the inquiry, the issue is the facial validity of the state's explanation. The state may not rebut a prima facie case of discrimination through mere denials of a discriminatory motive or protestations of good faith. Nevertheless, unless a discriminatory intent is inherent in the state's explanation,

30

the reason offered will satisfy the state's burden of production.

The Colorado court determined that low income individuals constituted a cognizable class. The exclusion from the grand jury was systematic, not random. The system allowed the State to discriminate on economic status. Thus, the defendants stated a prima facie violation of the statute. The State did not meet its burden of proffering a legitimate reason of exclusion based on a factor other than economic status. Instead, the State summarily dismissed potential jurors because of a fear that hourly wage earners would not appear for jury duty. A generalized assumption was insufficient.

The *Cerrone* court particularly qualified its opinion by noting that courts may excuse a potential juror from jury service on a finding of undue hardship. A finding of undue financial burden may constitute an undue hardship. The court, however, would not permit the State of Colorado to render a generalized assumption that all hourly wage earners would undergo too great an economic hardship to be able to serve on a grand jury.

Daniel Lazcano's case on appeal differs in important respects. Spokane County court staff did not systematically select for exclusion from the jury wage earners. Our trial court did not engage in systematic exclusion. The trial court excused only one juror for undue hardship because of his peculiar circumstances after that particular juror explained his situation. Other wage earners may have sat on the jury.

31

*State v. Ayer*, 150 N.H. 14, 834 A.2d 277 (2003) proposes a looser standard for purposes of excluding low income venire people. The *Ayer* court reviewed New Hampshire's version of the statutory prohibition from jury service "on account of race, color, religion, sex, national origin or economic status." *State v. Ayer*, 150 N.H. at 33 (quoting N.H. Rev. Stat. Ann. 500-A:4 (1997)). New Hampshire also had a statute allowing excuse of a juror upon a showing of undue hardship. The trial court excused thirty-two prospective jurors for financial hardship. The state high court, however, did not consider the exclusions as discriminating against or automatically excluding on the basis of their economic class. There was no evidence regarding the economic status of the selected jurors.

Daniel Lazcano argues that the trial court violated RCW 2.36.080(3) because the court excluded juror 2 on account his economic status. Nevertheless, the trial court excluded juror 2 because he would not receive pay for three weeks, the trial surrounded Christmas, and service on the jury would be an extreme hardship. Although the juror's economic status may have motivated juror 2 to seek removal, the trial court did not expressly or intentionally excuse the juror for this reason.

Daniel Lazcano incidentally argues that excusing juror 2 for financial hardship violated the juror's civil rights under RCW 49.60.030(1). The statute reads, in pertinent part:

32

> The right to be free from discrimination because of race, creed, color, national origin, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right.

"Economic status" is not a protected class under RCW 49.60.030(1).

B. Constitutional right

We now address Daniel Lazcano's constitutional challenge. A challenge of discriminatory selection of grand juries in state courts may be brought under the Equal Protection Clause of the Fourteenth Amendment. *Castaneda v. Partida*, 430 U.S. 482, 492, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). A traverse or petit jury challenge may be brought under the Fourteenth Amendment for purposeful class-based discrimination or under the fair cross-section requirement of the Sixth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 93, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); *Taylor v. Louisiana*, 419 U.S. at 525-26 (1975). "Discriminatory purpose" implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group. *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).

Lazcano relies only on the fair cross-section doctrine. To prevail on a fair cross-section claim, a litigant must prove: (1) that the group alleged to be excluded is a

33

distinctive group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

The purpose of the jury is to guard against the exercise of arbitrary power. The requirement that a jury represent a fair cross-section of the community is a fundamental part of the Sixth Amendment guarantee to a jury trial. *Taylor v. Louisiana*, 419 U.S. at 529 (1975). This guarantee is made binding on the states by virtue of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 148, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). Nevertheless, a defendant is not entitled to a jury of any particular composition nor is there a requirement that petit juries actually chosen be representative of the various distinct, economic, political, social or racial groups in the community. *Taylor v. Louisiana*, 419 U.S. at 538; *Thiel v. Southern Pacific Company*, 328 U.S. at 220 (1945). The defendant has the burden of establishing intentional discrimination or systematic exclusion of a certain social group or economic class from the jury. *People v. Gibbs*, 12 Cal. App. 3d 526, 539, 90 Cal. Rptr. 866 (1970).

States are free to grant exemptions from jury service to individuals in cases of special hardship or incapacity. *Taylor v. Louisiana*, 419 U.S. at 534 (1975). What

constitutes undue hardship lies within the discretion of the trial court, and includes one for whom jury service would impose an undue financial burden. *Thiel v. Southern Pacific Co.*, 328 U.S. at 224. Such exemptions do not pose substantial threats to the remaining pool of jurors being representative of the community. *Taylor v. Louisiana*, 419 U.S. at 534. Neither the jury nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. *Taylor v. Louisiana*, 419 U.S. at 538.

The court may not exclude all daily wage earners regardless of discrete wage earners' hardship. *Thiel v. Southern Pacific Co.*, 328 U.S. at 224. Nevertheless, the exclusion of a single person for financial hardship does not show a systematic or complete exclusion of low wage earners. *St. Clair v. Commonwealth*, 451 S.W.3d 597, 623 (Ky. 2014)

An appellate decision involving Charles Manson may not be a sound basis on which to promulgate law because of Manson's unique crimes. Nevertheless, Manson challenged his convictions on the ground that the trial court excused a large number of prospective trial jurors because of financial hardship. *People v. Manson*, 71 Cal. App. 3d 1, 139 Cal. Rptr. 275 (Cal. Ct. App. 1977). Manson contended that the jury was composed primarily of upper-middle-class persons who had their salaries paid while on jury duty. He claimed that the exclusion of the veniremen and women deprived him of

the services of persons whose outlook toward the Manson ogre myth might have been entirely different than that of the jurors actually chosen.

In *People v. Manson*, the California Supreme Court answered that Charles Manson's argument misconceives the function of the jury in our judicial system. A jury does not exist to serve either party, but to serve society and the cause of justice. A defendant of one economic status is not entitled to be tried by only jurors of the same economic status. The court noted that Manson made no showing that either an economic class was underrepresented in the jury pool or that such underrepresentation was due to purposeful state action.

In *State v. Ayer*, 150 N.H. 14, 834 A.2d 277 (2003), already discussed because of New Hampshire's similar statute, the court also addressed a constitutional challenge to the jury panel. The court noted that jurors excused for financial hardship do not necessarily hold similar attitudes with regard to the legal system. The only characteristic in common among the group was the raising of a concern regarding the economic impact to themselves or their families of serving on a jury for three weeks. No logical inference could even be drawn regarding each group member's economic status. A person who is self-employed or works on a commission may earn a substantial income, the absence of which would impose a hardship upon that individual's ability to maintain his or her standard of living.

36

In other cases, the courts also dismissed arguments that the defendant's constitutional rights were violated because of dismissal of jurors on the basis of financial hardship. *Atwood v. Schriro*, 489 F. Supp. 2d 982 (D. Ariz. 2007); *People v. Carpenter*, 21 Cal. 4th 1016, 988 P.2d 531, 90 Cal. Rptr. 2d 607 (1999); *People v. Davis*, 137 Misc. 2d 958, 522 N.Y.S.2d 1017 (N.Y. Sup. Ct. 1987); *People v. Reese*, 670 P.2d 11 (Colo. App. 1983). In *Atwood v. Schriro*, and *People v. Carpenter*, the court further denied the defendant's claim that excusing jurors for financial hardship also led to a racially discriminatory panel.

## Prosecutorial Vouching

Jamie Whitney and Ben Evensen testified to the detriment of Daniel Lazcano. Whitney testified that Lazcano said, "'I can't believe I did this,'" and also testified that the Lazcano brothers plotted to each take the blame to spare the other. RP (Dec. 5, 2013) at 849. Ben Evensen also testified how Daniel essentially confessed to him. In turn, the State entered as exhibits plea agreements from Whitney and Evensen, as well as Eli Lindsey and McKyndree Rogers, all of which agreements contained language that the party agreed to "testify truthfully" at trial. The prosecutor also asked Travis Carlon on two occasions whether he testified truthfully. From this testimony, Daniel Lazcano contends the prosecutor expressly vouched for the four witnesses' credibility during closing argument.

37

Trial counsel for Daniel Lazcano never objected to the testimony of Jamie Whitney, Ben Evensen, and Travis Carlon. On appeal, Lazcano contends his trial counsel's omission constituted ineffective assistance of counsel. Rather than analyze Lazcano's assignment of error as one involving ineffective assistance of counsel, we address directly the subject of vouching.

Daniel Lazcano's assignment of error raises prosecutorial misconduct. A prosecutorial misconduct inquiry consists of two prongs: whether the prosecutor's conduct was improper, and if so, whether the improper conduct caused prejudice. *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). When the defendant fails to object to the prosecutor's conduct or request a curative instruction at trial, the misconduct is reversible error only if the defendant shows the misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Lindsay*, 180 Wn.2d at 430.

A prosecutor cannot express a personal opinion as to a defendant's guilt or a witness's credibility independent of the evidence in the case. *State v. Lindsay*, 180 Wn.2d at 437; *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012). The personal opinion is prohibited because the question of whether a witness has testified truthfully is entirely for the jury to determine. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion). A prosecutor commits misconduct by vouching

38

for a witness's credibility. *State v. Robinson*, 189 Wn. App. 877, 892, 359 P.3d 874 (2015). Vouching may occur in two ways: the prosecution places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony. *State v. Robinson*, 189 Wn. App. at 892-93; *State v. Coleman*, 155 Wn. App. 951, 957, 231 P.3d 212 (2010). Even going beyond comments by the prosecution, a witness's testimony that he or she spoke the truth and abides by the terms of a plea agreement may amount to a mild form of vouching. *State v. Ish*, 170 Wn.2d at 197.

Daniel Lazcano principally relies on *State v. Ish*, 170 Wn.2d 189. Nathaniel Ish claimed the prosecutor committed misconduct by vouching for his jail cellmate's credibility when referencing the cellmate's agreement to testify truthfully. Before the cellmate testified, Ish objected to any question regarding the cellmate's agreement to testify truthfully. The trial court allowed the State to establish the agreement terms, including the truthful testimony requirement. During direct examination in its case in chief, the prosecutor asked the cellmate about the type of testimony he agreed to provide, to which he responded "truthful testimony." During redirect, the prosecutor asked the cellmate if his plea agreement included a term for truthful testimony, and he replied yes. At the end of redirect, the prosecutor asked the cellmate if he had testified truthfully, and he replied that he had.

39

The Supreme Court, in *State v. Ish*, affirmed Ish's conviction. A majority of the justices agreed that the trial court erred by allowing the prosecutor to introduce evidence during the State's case in chief that the plea agreement required the cellmate to testify truthfully. Four justices reasoned that, when the credibility of the witness had not previously been attacked, referencing the cellmate's out-of-court promise to testify truthfully was irrelevant and had the potential to prejudice the defendant by placing the prestige of the State behind the cellmate's testimony. Nevertheless, these four justices concluded that the trial court's error was harmless.

In *State v. Ish*, four other justices concurred in the result in a separate opinion. The concurring justices would have decided the case on a different basis by using the balancing test of ER 403. They concluded, on the basis of several Court of Appeals decisions, that the questioning about the plea agreement was proper. These justices reasoned:

> [U]nder ER 403, we should weigh the prejudice engendered by the "testify truthfully" language in a plea agreement against the State's legitimate purposes for questioning a witness about a plea agreement. When the State offers a witness who has agreed to testify as part of a plea agreement, the existence of a "deal" is an obvious ground for impeachment. It shows potential bias and motivation to lie. . . . In the face of obvious (and damning) lines of questioning on cross-examination, the prosecutor in this case wished to present [the cellmate's] testimony in its true context—as part of a plea deal in exchange for truthful testimony. By questioning [the cellmate] on direct examination about this issue, the prosecutor intended to "pull the sting" from the anticipated cross-examination.

*State v. Ish*, 170 Wn.2d at 202. Significantly, despite the difference in views over the admissibility of the evidence, both the lead and concurring opinions agreed that some circumstances may warrant the State to preemptively "pull the sting" from an anticipated attack on the credibility of a witness during the State's case in chief. *State v. Ish*, 170 Wn.2d at 199 n.10, 203-04.

A. Ben Evensen

We now address the appropriateness of questioning with regard to each of the four witnesses. During opening arguments, defense counsel aggressively attacked the credibility of State's witness, Ben Evensen. Counsel referred to Evensen as a jailhouse snitch, who agreed to testify for a deal with the prosecution. During the State's direct examination of Evensen, the trial court admitted as an exhibit a letter from the prosecution to Ben Evensen's attorney. The letter stated that Evensen agreed to testify truthfully. The prosecutor asked Evensen several times whether the agreement required him to be truthful in his testimony, and Evensen agreed. The prosecutor also directly asked Evensen if he told the truth, and Evensen said he did.

We conclude the prosecutor did not commit misconduct when it proffered Ben Evensen's plea agreement on direct examination or when questioning Evensen on direct examination because defense counsel, during opening statements, attacked Evensen's

41

credibility. Counsel introduced Evensen's lack of credibility as a central defense theory.

Under *Ish*, the prosecutor, during the State's case in chief, properly preemptively

"pull[ed] the sting" from this anticipated attack. Daniel Lazcano's prosecutor addressed

Evensen's credibility after Lazcano pulled a string.

B. Eli Lindsey, Jamie Whitney, and McKyndree Rogers

During direct examination of Eli Lindsey, Jamie Whitney, and McKyndree

Rogers, the trial court, at the State's request, admitted letters to the three witnesses'

respective attorneys. In each letter, the witness agreed to testify truthfully in exchange

for immunity or a plea agreement. During direct examination of each witness, the

prosecutor asked each witness if he or she told the truth.

On appeal, the State concedes that it improperly introduced the terms of Eli

Lindsey's, Jamie Whitney's, and McKyndree Rogers's plea or immunity agreements

during direct examination without the defense first attacking the witnesses' credibility.

Nevertheless, Daniel Lazcano did not object to any of the questioning, whereas the

defense in *Ish* objected to the questions regarding the cellmate's agreement to testify

truthfully. Lazcano never moved to strike the answer or request a curative instruction.

Daniel Lazcano must demonstrate that the prosecutor's conduct was so flagrant

and ill-intentioned that no instruction could have cured the prejudice. Here, if the court

had been asked to give a proper curative instruction, it would have cured a problem by

directing the jury to disregard the part of the answer that refers to "truthfully." *See State v. Frank Lazcano*, 188 Wn. App. at 369 (2015) (finding defendant did not object to witnesses' testimony about how they agreed to testify truthfully and a curative instruction would have neutralized the prejudice).

Remember that Daniel Lazcano also argues that defense counsel rendered ineffective assistance in failing to object to the testimony regarding and the admission of the plea and immunity agreements. Nevertheless, a defendant cannot claim ineffective assistance if defense counsel's trial conduct can be characterized as legitimate trial strategy or tactic. *State v. Benn*, 120 Wn.2d 631, 665, 845 P.2d 289 (1993). The decision whether to object is a classic example of trial tactics and, only in egregious circumstances, will the failure to object constitute ineffective assistance of counsel. *State v. Kolesnik*, 146 Wn. App. 790, 801, 192 P.3d 937 (2008).

The State properly admitted the plea agreement of Ben Evensen. The jury could reasonably have concluded that other State witnesses, who were former friends and colleagues of Daniel and Frank Lazcano, entered similar agreements with the State. Given the presumption that counsel rendered adequate assistance and made significant decisions in the exercise of reasonable professional judgment, we can infer that defense counsel's decision not to object to the exhibits and testimony concerning McKyndree

43

Roger's, Eli Lindsey's, and Jamie Whitney's agreements was strategic. An objection could have highlighted the jury's attention to this testimony.

C. Travis Carlon

Daniel Lazcano also argues that the prosecutor committed misconduct when he asked Travis Carlon on two occasions whether he was being truthful. The State responds that its counsel never posed this question to Carlon. The State is correct. Carlon was questioned extensively about the favorable plea agreement he received in exchange for his continued cooperation, but the prosecutor never asked him whether the plea agreement requires him to testify truthfully. Moreover, unlike the other plea agreements, the prosecutor never sought to admit Mr. Carlon's agreement as an exhibit.

D. Closing argument

Daniel Lazcano argues that the prosecutor expressly vouched for Ben Evensen's credibility during closing argument. Lazcano relies on the following passage:

> And we have the testimony of Ben Evensen on February the 12th and 13th . . . [W]e have the testimony of Ben Evensen on February the 27th . . . [W]e have the testimony of Ben Evensen on May 31st and June the 3rd . . . And every single time, he has told the truth. I forgot: a recorded interview of Ben Evensen . . . on July the 30th of 2012. Every single time, he's told the truth.
> Every single time, he said, "Marcus told me"—excuse me. He said, "Dan told me he waited out back. 'Marcus ran out and Marcus was running, and I said, *Marcus, stop, stop*. And Marcus wouldn't stop. And so I raised up and I went 'bop-bop-bop.'"

44

RP (Dec. 17, 2013) at 1980. Lazcano did not object to this argument. Note that the

prosecution did not couch his argument in a personal belief or the belief of the State.

Instead, he bolstered the testimony of Ben Evensen by noting his story's consistency

through time. Therefore, we reject Lazcano's contention.

In the context of closing arguments, the prosecutor has wide latitude in making

arguments to the jury and prosecutors are allowed to draw reasonable inferences from the

evidence. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Instead of

examining improper conduct in isolation, this court considers the prosecutor's alleged

improper conduct in the context of the total argument, the issues in the case, the evidence

addressed in the argument, and the jury instructions. *State v. Monday*, 171 Wn.2d 667,

675, 257 P.3d 551 (2011).

*State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008) is an important decision

on the subject of vouching. The prosecutor argued during closing argument that details

in the victim's testimony gave her testimony a "badge of truth" and the "ring of truth."

*State v. Warren*, 165 Wn.2d at 30. The prosecutor commented on specific parts of the

victim's testimony that "rang out clearly with truth in it" and argued that the victim

would not know that level of detail if the crime had not occurred. *State v. Warren*, 165

Wn.2d at 30. The *Warren* court held that this argument was not improper vouching for

the credibility of a witness. The court reasoned that defense counsel attacked the victim's

45

credibility during opening statements and cross-examination and then observed that the prosecutor responded by arguing that the detail in the victim's testimony raised a reasonable inference that she told the truth.

Like in *State v. Warren*, defense counsel attacked Ben Evensen's credibility in opening argument and on cross-examination. The parties contentiously disputed Evensen's credibility throughout the trial. In closing, the prosecution sought to establish that Evensen rendered consistent statements every time he described the murder. Like the prosecutor's argument in *Warren* that the details in the victim's testimony gave her testimony a "badge of truth," this argument was not improper in the context of the total argument and the issues in the case.

## Sufficiency of Evidence

Daniel Lazcano challenges the sufficiency of evidence to convict him of first degree murder. The challenge requires a review of evidence to determine if sufficient evidence supported a conviction for the alternate means of first degree murder alleged by the State. The State contended that Lazcano committed first degree murder by premeditation and by participating in a first degree burglary.

Washington's first degree murder statute, RCW 9A.32.030, provides, in relevant part:

(1) A person is guilty of murder in the first degree when:

46

(a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person; or

. . . .

(c) He or she commits or attempts to commit the crime of . . . burglary in the first degree . . . and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

RCW 9A.08.020(3)(a), the general accomplice statute, and RCW 9A.32.030, the felony murder statute, supply alternative grounds under which an accused, who did not shoot the victim, may be found guilty of murder. The felony murder provision of the first degree murder statute establishes a separate mechanism by which one who commits a predicate felony may be criminally liable for a homicide committed in the course of that felony by a coparticipant in the commission of the underlying felony. *State v. Carter*, 154 Wn.2d 71, 78, 109 P.3d 823 (2005). The participant liability clause of the felony murder provision serves as a built-in vicarious liability provision that provides a mechanism by which liability for a homicide may be imputed to a coparticipant who does not commit a homicide. *State v. Carter*, 154 Wn.2d at 79. Thus, though one participant in a predicate felony, alone, commits a homicide during the commission of, or flight from, such felony, the other participant in the predicate felony has, by definition, committed felony murder. *State v. Carter*, 154 Wn.2d at 79. In such cases, the State need not prove that the nonkiller participant was an accomplice to the homicide. *State v. Bolar*, 118 Wn. App. 490, 504-05, 78 P.3d 1012 (2003).

47

Daniel Lazcano argues that insufficient evidence supports his conviction for first degree murder under each of the alternative means of first degree murder contained in the jury instruction. An alternative means case involves a single offense that may be committed in more than one manner. A jury must always be unanimous in declaring the accused guilty of the crime charged. *State v. Crane*, 116 Wn.2d 315, 325, 804 P.2d 10 (1991). Nevertheless, the jury need not unanimously agree to the means by which the accused committed the crime so long as substantial evidence supports each alternative means. *State v. Crane*, 116 Wn.2d at 325-26. In Washington, premeditated murder and felony murder are alternative means of committing first degree murder. *State v. Fortune*, 128 Wn.2d 464, 468, 909 P.2d 930 (1996).

The trial court impliedly instructed the jury that it may convict Lazcano of first degree murder if: (1) Lazcano shot Marcus Schur with premeditation, or (2) Lazcano shot Schur during the course of Frank Lazcano burglarizing Nick Backman's home. The trial court also gave a general accomplice liability instruction. Because the court instructed the jury that it need not be unanimous as to which alternate the State proved, this court must determine whether sufficient evidence upheld all alternatives.

In a criminal case, the State must provide sufficient evidence to prove each element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). When a defendant challenges the

48

sufficiency of the evidence, the proper inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Salinas*, 119 Wn.2d at 201. A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Salinas*, 119 Wn.2d at 201.

In a challenge to the sufficiency of the evidence, circumstantial evidence and direct evidence carry equal weight. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). This court's role is not to reweigh the evidence and substitute its judgment for that of the jury. *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). Instead, because the jurors observed the witnesses testify firsthand, this court defers to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decision regarding the persuasiveness and the appropriate weight to be given the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

A. Sufficiency of evidence for felony murder

The State employed first degree burglary as the predicate crime for felony murder. The statute creating the crime of first degree burglary declares:

49

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1). Frank Lazcano assaulted Marcus Schur and Amber Jones in Nick Backman's house. Evidence showed that Frank entered the house with the purpose of assaulting at least Schur.

We have already quoted the first degree murder statute. A person commits first degree felony murder if the person "commits or attempts to commit . . . burglary in the first degree . . . and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants." RCW 9A.32.030(1)(c).

Daniel Lazcano argues that first degree burglary, based on assault, can never substantiate a first degree felony murder charge because the assault and the murder constitute the same act. Lazcano relies on *In re Personal Restraint of Andress*, 147 Wn.2d 602, 610, 56 P.3d 981 (2002). *Andress* held that assault could not serve as the predicate felony for second degree felony murder under former RCW 9A.32.050(1)(b) because the "in furtherance of" language would be meaningless as to that predicate felony. In other words, the underlying assault is not independent from the homicide, because homicide cannot result without an assault. The *Andress* court distinguished

50

assault from valid predicate felonies like arson, which were distinct from but related to the homicide. Of course, in *Andress*, the assault and the homicide constituted the same act.

*Personal Restraint of Andress* does not control this appeal for several reasons. First, *Andress* entailed charges for second degree felony murder. The State charged Daniel Lazcano with first degree, not second degree, felony murder. Assault is not a qualifying felony for first degree felony murder. First degree burglary qualifies instead as a predicate for first degree murder. Assault is simply an element of first degree burglary. *Andress*'s reasoning does not apply because first degree burglary is distinct from but related to the homicide, and can occur independently of the homicide.

Second, following *Personal Restraint of Andress*, the legislature amended the second degree felony murder statute and expressly declared assault as a predicate crime to second degree felony murder. LAWS OF 2003, ch. 3, § 1. The legislature wrote: "The legislature does not agree with or accept the court's findings of legislative intent in *State v. Andress*, . . . and reasserts that assault has always been and still remains a predicate offense for felony murder in the second degree." LAWS OF 2003, ch. 3, § 1.

Third, Daniel Lazcano fails to note that his brother assaulted Marcus Schur inside the house as part of a scheme to flush Schur outside the house, where Lazcano awaited

51

him. Frank Lazcano's assault of Schur was a distinct act from Daniel's shooting or second assault on Schur.

Daniel Lazcano argues insufficient evidence supports a determination that he knew Frank would assault Marcus Schur or Ambrosia Jones. The felony murder statute does not require such a determination. Anyway, evidence showed that Daniel and Frank planned for Frank to frighten Schur into fleeing out the back door of the residence. Frightening Schur could include assaulting him.

B. Sufficiency of evidence for accomplice liability

Daniel Lazcano also argues there was no evidence that he knew he was promoting the commission of a crime because he did not know that Frank was going to assault Marcus Schur or push Ms. Jones. Citing *State v. Roberts*, the State argues that an accomplice need not have specific knowledge of every element of the crime committed by the principal, provided he or she has general knowledge of that specific crime. *State v. Roberts*, 142 Wn.2d 471, 512, 14 P.3d 713 (2000).

We need not apply the fine distinction asserted by the State. Taking all reasonable inferences in favor of the State and drawing them strongly against Daniel Lazcano, sufficient evidence supported a jury determination that Lazcano knew Frank would commit first degree burglary based on assault. Ben Evensen's mother testified that she had conversations with the brothers about confronting Marcus Schur. She testified she

tried to persuade them not to do it. Daniel Lazcano told his friend, Kyle Evans, that he wished to find Schur and "beat [his] ass." RP (Dec. 3, 2013) at 412. Frank became an integral part of this plan. He agreed with Daniel to assist in the thumping. Daniel Lazcano knew Schur lingered inside the Backman house when Frank entered. Daniel must have known that Frank's entry of the home would invite violence. Frank had warned Amber Jones, in the presence of Daniel, that, if Frank found Schur to be implicated in the robbery, he would kill him.

Ben Evensen testified that the brothers planned for Frank to enter the house to "flush" Schur. Daniel waited outside to attack Schur once Frank cleared Schur from the home. An assault could readily accompany the flush. Drawing all reasonable inferences in favor of the State, the evidence here was sufficient for a jury to reasonably infer that Daniel Lazcano was an accomplice to Frank Lazcano's burglary of Nick Backman's house.

C.  Sufficiency of evidence for premeditation

Finally, Daniel Lazcano contends the State also failed to prove premeditation beyond a reasonable doubt. Lazcano emphasized that he told Ben Evensen that he did not travel to Nick Backman's house to kill Marcus, but only to frighten him. He then argues that he panicked when Marcus appeared in the alley and reacted involuntarily when shooting. He later expressed remorse over Marcus Schur's death. According to

53

Lazcano, all of these facts and circumstances indicate that Daniel did not premeditate killing Marcus. In so arguing, Lazcano construes the evidence in a light most favorable to him. When we review the sufficiency of evidence for a conviction, we view the evidence in the opposite light. *State v. Salinas*, 119 Wn.2d at 201 (1992).

"Premeditation," for purposes of first degree murder, is the deliberate formation of and reflection on the intent to take a human life and involves the mental process of thinking beforehand, deliberating on, or weighing the contemplated act for a period of time, however short. *State v. Ra*, 144 Wn. App. 688, 703, 175 P.3d 609 (2008). Premeditation requires more than a moment in time. RCW 9A.32.020(1). The State may prove premeditation by circumstantial evidence when the inferences argued are reasonable and the evidence supporting them is substantial. *State v. Ra*, 144 Wn. App. at 703. Examples include: motive, prior threats, multiple wounds inflicted or multiple shots, striking the victim from behind, assault with multiple means or a weapon not readily available, and the planned presence of a weapon at the scene. *State v. Ra*, 144 Wn. App. at 703.

Assuming the truth of the State's evidence, nearly all factors weigh in favor of finding premeditation. Daniel Lazcano possessed a motive to kill Marcus Schur based on the burglary. Lazcano sought to locate Schur for over a week. Lazcano also threatened to confront Schur during multiple discussions with multiple people. The State presented

54

no evidence that Lazcano threatened to kill Schur, but Frank uttered such a threat in the presence of Daniel. Lazcano brought his AK-47 to Nick Backman's house. He took the firearm with him as he ran to the back of the house while Frank tried to flush Schur from the home. Lazcano stood in wait. Lazcano fired multiple shots after taking time to raise the rifle and yell, "'Stop, Marcus.'" RP (Dec. 9, 2013) at 980.

In short, sufficient evidence supports Lazcano's conviction for first degree murder on each of the alternate means of felony murder and premeditation.

Felony Firearm Offender Registration

Daniel Lazcano contends the trial court erred when it determined he must register as a felony firearm offender. The relevant statute, and version of the statute in application at the time of Lazcano's sentence, read:

> (1) On or after July 28, 2013, whenever a defendant in this state is convicted of a felony firearm offense . . . the court must consider whether to impose a requirement that the person comply with the registration requirements of RCW 9.41.333 and may, in its discretion, impose such a requirement.
> (2) In determining whether to require the person to register, the court shall consider all relevant factors including, but not limited to:
> (a) The person's criminal history;
> (b) Whether the person has previously been found not guilty by reason of insanity of any offense in this state or elsewhere; and
> (c) Evidence of the person's propensity for violence that would likely endanger persons.

Former RCW 9.41.330 (2014). Note that the statute references a "felony firearm

offense," but does not mention a "felony firearm offender."

RCW 9.41.010(8)(e) defines "felony firearm offense" as:

> Any felony offense if the offender was armed with a firearm in the
> commission of the offense.

RCW 9.41.010(7) defines "felony firearm offender" as a person:

> who has *previously* been convicted . . . of any felony firearm
> offense.

(Emphasis added.)

Daniel Lazcano's crime meets the definition of "felony firearm offense." The jury

found Lazcano to be armed with a firearm when he shot Marcus Schur. Nevertheless,

before the trial on appeal, Lazcano had never been convicted of a felony. Therefore, he

argues that he does not qualify as a "felony firearm offender," because he had not

previously been convicted of any felony firearm crime.

Daniel Lazcano's argument fails because the controlling statute, RCW 9.41.330,

does not require that he be a felony firearm offender as defined in RCW 9.41.010(7) or

any other statute. Instead, RCW 9.41.330 affords the trial court discretion to order

registration on any conviction for a felony firearm offense after reviewing certain factors.

RCW 9.41.330 does not require two firearm offenses before registration.

## Cumulative Error

Daniel Lazcano contends that the prosecutorial vouching, the jury unanimity error, and the insufficient evidence to support each alternative means of first degree murder, when aggregated, violated his rights to due process and a fair trial. The cumulative error doctrine applies when several trial errors, none of which alone suffices to warrant reversal, but when combined may have denied the defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

We find error only in the admission of plea agreements containing language wherein witnesses agreed to testify truthfully. We previously held the errors to be harmless.

## Statement of Additional Grounds

We now address Daniel Lazcano's statement of additional grounds.

Daniel Lazcano argues we should reverse his conviction because the prosecutor knowingly presented false evidence from Amber Jones, contrary to the *Mooney-Napue* line of cases. *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935). Under those cases, a conviction will be reversed if the prosecution knowingly presented false evidence or testimony at trial and there is a reasonable likelihood that the false evidence or testimony could have affected the jury's decision. *Morris v. Ylst*, 447 F.3d 735, 743 (9th

Cir. 2006). To prevail on a claim based on *Mooney-Napue*, the defendant must show that (1) the testimony or evidence was false, (2) the prosecution knew or should have known that the testimony was false, and (3) that the false testimony was material. *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).

Daniel Lazcano alleges that Amber Jones testified falsely when she described, during the third trial, peering through the window of Nick Backman's house immediately following the murder:

> Q. Did you think you recognized anybody inside the car?
> A. I thought I seen maybe Daniel. I wasn't for sure. It looked like somebody that—it looked familiar.
> Q. Okay. So you're not 100 percent sure but—
> A. No.
> Q. —but you thought it was Dan?
> A. Yes.
> Q. And you're not 100 percent sure because—was it because it was very dark that night?
> A. Yes. And it was raining.

RP (Dec. 3, 2013) at 432. Lazcano claims Jones' third trial testimony differed from her first trial testimony, when she testified that she "didn't get a very good look at exactly who it was." RP (Feb. 12, 2013) at 182. He further contends that Jones' third trial testimony also conflicted with testimony in his second trial, when she testified she "thought it had been Daniel" because she recognized his car. RP (May 30, 2013) at 1416.

Daniel Lazcano does not establish false testimony by Amber Jones. Her testimony during the three trials remained consistent. She always averred that she could not for sure identify Lazcano.

Daniel Lazcano next assigns error to the introduction of testimony by Jeffrey Reynolds, the prosecution's expert witness, regarding ballistics. Lazcano characterizes the testimony as unreliable and speculative in nature. He contends that Reynolds lacked qualifications to testify about ballistics.

Daniel Lazcano never objected to Jeffrey Reynolds' qualifications at trial and thus did not preserve the issue for appeal. RAP 2.5(a). Daniel Lazcano complains about the speculative nature of Reynolds' testimony. Nevertheless, Lazcano objected only to Reynolds' rebuttal testimony on the grounds of repetition. He therefore also waived appellate review of this issue. An objection on different grounds to expert scientific testimony does not preserve the issue for appeal. *State v. Newbern*, 95 Wn. App. 277, 291, 975 P.2d 1041 (1999).

Daniel Lazcano argues that the State failed to preserve bullet fragments in Marcus Schur's body, and the spoliation violated his due process rights. Jeffrey Reynolds recovered some bullet fragments, but decided not to look for the remainder of the original bullet because the remaining fragmentation would not be testable. The State called a second ballistics expert, Glen Davis, an employee of the state crime laboratory, who

examined the bullet fragments recovered by Reynolds from the corpse during the autopsy. Davis opined that the bullet bits were consistent with the size rounds fired by the AK-47.

Under *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988) and *State v. Wittenbarger*, 124 Wn.2d 467, 880 P.2d 517 (1994), whether destruction of evidence constitutes a due process violation depends on the nature of the evidence and the motivation of law enforcement. *State v. Groth*, 163 Wn. App. 548, 557, 261 P.3d 183 (2011). If the State fails to preserve "material exculpatory evidence," criminal charges must be dismissed. *Wittenbarger*, 124 Wn.2d at 475. In order to be considered "material exculpatory evidence," the evidence must possess an exculpatory value apparent before its destruction and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Wittenbarger*, 124 Wn.2d at 475. The State's failure to preserve evidence merely "potentially useful" does not violate due process unless the defendant shows bad faith on the part of law enforcement. "Potentially useful" evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *State v. Groth*, 163 Wn. App. at 557.

Jeffrey Reynolds testified that whatever fragment remained of the original bullet could not be tested. Daniel Lazcano presented no contrary testimony. The evidence

could not have exonerated Lazcano.

Daniel Lazcano argues that the State elicited hearsay statements from Travis Carlon about the AK-47 rifle being used in the murder. On direct examination, Carlon testified that Frank Lazcano lay the AK-47 in his trunk, but then denied that either brother told him that the AK-47 was used to shoot Marcus Schur. The State then asked Carlon about a statement he previously gave Undersheriff Rockness, in which he told Rockness that the Lazcano brothers told him they used an AK-47. The State asked Travis Carlon about his prior statement in order to impeach him. Thus, Carlon's answers were not admitted for their truth and were not hearsay. ER 801(c). Lazcano argues that the State used Carlon's earlier statements as substantive evidence of Lazcano's guilt during closing argument, but Lazcano never objected or asked the trial court to limit their use to impeachment purposes.

Daniel Lazcano also argues that the prosecutor's closing argument assumed facts not in evidence because he asked the jury to infer that Lazcano told Travis Carlon he killed Marcus Schur. Carlon repeatedly testified that he "assumed" the brothers killed Schur, based on their statements and actions, even though Carlon declared that the brothers never explicitly confessed. In closing, the prosecutor argued Carlon's denial of an express concession was unbelievable and that Lazcano probably told Carlon of the details of the murder.

61

The prosecutor's closing argument did not assume facts not in evidence. The prosecution acknowledged that Travis Carlon never testified that the brothers expressly told him what happened. The prosecution encouraged, based on other evidence, the jury to draw a reasonable inference of the brothers telling Carlon they killed Marcus Schur. In closing argument, the prosecutor has wide latitude in arguments to the jury and may ask the jury to draw reasonable inferences from the evidence. *State v. Fisher*, 165 Wn.2d at 747 (2009).

Daniel Lazcano argues the trial court's ruling in limine to prevent him from cross-examining James Holdren about mental health issues limited his ability to confront Holdren. Lazcano argues that Holdren's mental incompetency was relevant to show possible error in how the witness perceived events or recalled them. As authority, he cites *State v. Darden*, 145 Wn.2d 612, 41 P.3d 1189 (2002) and *State v. Froehlich*, 96 Wn.2d 301, 635 P.2d 127 (1981).

The federal and state constitution's guarantee the right to confront and cross-examine adverse witnesses. U.S. CONST. amend VI; CONST. art. I, § 22. This right includes the right to conduct a meaningful cross-examination of adverse witnesses. *State v. Darden*, 145 Wn.2d at 620 (2002). The defendant should be free to test the perception, memory, and credibility of witnesses. *State v. Darden*, 145 Wn.2d at 620. Confrontation helps assure the accuracy of the fact-finding process. *State v. Darden*, 145 Wn.2d at 620.

Cross-examination as to a mental state or condition, to impeach a witness, is permissible. *State v. Froehlich*, 96 Wn.2d at 306 (1981). Cross-examination is one of several recognized means of attempting to demonstrate that a witness has erred because of his mental state or condition. *State v. Froehlich*, 96 Wn.2d at 306.

Like all constitutional rights, the right to confront witnesses faces limits. The right to cross-examine adverse witnesses is not absolute. *State v. Darden*, 145 Wn.2d at 620. The trial court, within its sound discretion, may deny cross-examination if the evidence sought is vague, argumentative, or speculative. *State v. Darden*, 145 Wn.2d at 620-21. Evidence rules may limit the right of cross-examination. *State v. Darden*, 145 Wn.2d at 620-21.

The trial court ruled that Daniel Lazcano could not examine James Holdren about his psychiatric episodes because of the lack of relevance. The trial court expressed concern that Lazcano wanted to make Holdren appear incompetent so the jury would think Holdren committed the murder. The court, however, allowed Lazcano to ask Holdren about relevant acts, such as his phone call to a police officer in which he expressed a belief of planted ammunition in his vehicle. We hold the trial court did not abuse its discretion in balancing Lazcano's rights to confrontation with the limiting considerations of relevance and undue prejudice. The trial court reasonably limited questioning to mental health problems near in time to the shooting of Marcus Schur.

Daniel Lazcano next contends the prosecution engaged in misconduct when the prosecution questioned Travis Carlon about statements he made to Carlon's wife and Jamie Whitney about Carlon's belief that Lazcano committed the murder. The trial court granted a motion in limine to preclude this questioning of Carlon. Nonetheless, during direct examination, the prosecutor asked Travis Carlon if he told his wife that Lazcano shot Marcus Schur and if he had told Eli Lindsey that Lazcano shot Schur. Lazcano objected both times on grounds of relevance, and the trial court sustained the objections. On appeal, Lazcano argues that these repeated questions elicited testimony similar to that the trial court excluded and that the prosecution's tactics constituted trial by innuendo.

A criminal defendant must only be convicted by evidence, not innuendo. *State v. Ruiz*, 176 Wn. App. 623, 641, 309 P.3d 700 (2013). When a prosecutor's questions refer to extrinsic evidence never introduced, deciding if the questions are inappropriate requires examining whether the focus of the questioning imparts evidence within the prosecutor's personal knowledge without the prosecutor formally testifying. *State v. Miles*, 139 Wn. App. 879, 887, 162 P.3d 1169 (2007); *State v. Lopez*, 95 Wn. App. 842, 855, 980 P.2d 224 (1999).

In the case on appeal, the prosecutor did not seek to place unavailable evidence before the jury. The prosecutor already established that, at least according to Travis Carlon, Daniel Lazcano committed the murder. Carlon earlier described how he drove

with the brothers into the country to hide the body, how Daniel repeatedly uttered in the car, "'Uncle, I fucked up,'" and how Carlon assumed Lazcano killed Schur. RP (Dec. 4, 2013) at 524. In asking Carlon if he told his wife or Eli Lindsey that Lazcano shot Mr. Schur, the prosecutor did not imply the existence of any evidence the jury did not already have. The prosecutor probably violated the trial court's evidentiary ruling, but the conduct was not equivalent to a trial by innuendo.

Daniel Lazcano argues that the prosecutor mischaracterized the standard for "premeditation" in his closing argument. RCW 9A.32.020 defines "premeditation," for purposes of murder in the first degree, as involving "more than a moment in point of time." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.01.01, at 360 (3d ed. 2008) incorporates this same language. In closing argument, the prosecutor characterized "premeditated" as "just more than a moment in time, that's all. It doesn't mean they thought about it for a day or two." RP (Dec. 17, 2013) at 1991. The prosecution's argument accurately stated the law.

Daniel Lazcano argues that the prosecutor argued facts not in evidence during closing argument when he argued that Lazcano stated to Nicole Carlon that he looked for the shells from the AK-47. Nevertheless, the record contains this evidence. Nicole Carlon testified that Lazcano stated he could not find the shell casings, that the casings had flung "pretty far, like they were gone." RP (Dec. 16, 2013) at 1875-76.

65

Daniel Lazcano next argues that the prosecutor impermissibly impugned defense counsel when stating the defense wishes the jury to travel to Wonderland. A prosecutor may argue that the evidence does not support the defense theory. *State v. Lindsay*, 180 Wn.2d at 431 (2014). Nevertheless, a prosecutor must not impugn defense counsel's role or integrity. *State v. Lindsay*, 180 Wn.2d at 431-32. Impugning defense counsel severely damages an accused's opportunity to present his or her case. *State v. Lindsay*, 180 Wn.2d at 432.

Daniel Lazcano cites *State v. Thorgerson*, 172 Wn.2d 438, 258 P.3d 43 (2011). In that case, the prosecutor argued during closing argument that:

> The entire defense is sl[e]ight of hand. Look over here, but don't pay attention to there. Pay attention to relatives that didn't testify that have nothing to do with the case . . . Don't pay attention to the evidence.

*State v. Thorgerson*, 172 Wn.2d at 451 (alteration in original). The court held the prosecutor's comments improper but did not reverse because the comments likely did not alter the outcome of the case and an instruction could have cured the prejudice.

In this appeal, even assuming the prosecutor's *Alice in Wonderland* argument was improper, the argument likely did not impact the outcome. An instruction could have cured the prejudice, and the comments were not flagrant or ill-intentioned.

Daniel Lazcano argues, for the first time on appeal, that the trial court improperly admitted statements made by Frank Lazcano to Deputy Tim Cox during Deputy Cox's

questioning of Frank. We reject this claimed error because a defendant must raise a Sixth Amendment confrontation clause claim at or before trial or lose the benefit of the right. *State v. O'Cain*, 169 Wn. App. 228, 247-48, 279 P.3d 926 (2012). We also note that Sheriff Deputy Cook testified that Frank told him he went to confront Marcus Schur alone, he left when he heard gunshots, and Daniel was at his girlfriend's house in Spokane that evening. Thus, the statement did not implicate Lazcano.

Daniel Lazcano argues the trial court violated his right to plead guilty when it rejected the proposed plea agreement and the State's amendment charging him with second degree manslaughter. This assignment of error relates to our earlier holding that the trial court did not abuse its discretion when rejecting a plea agreement. This court reviews whether the trial court deprived a defendant of his or her rule-based right to plead guilty to the original charges de novo. *State v. Conwell*, 141 Wn.2d at 906 (2000).

Months before the plea hearing, Daniel Lazcano had pled not guilty and undergone two trials. The right to plead guilty only exists when the defendant has not yet entered any kind of plea. *State v. James*, 108 Wn.2d 483, 487, 739 P.2d 699 (1987). Once the defendant enters a legally sufficient plea of not guilty the defendant's right to plead guilty is no longer unconditional. *State v. James*, 108 Wn.2d at 488; *State v. Duhaime*, 29 Wn. App. 842, 852-55, 631 P.2d 964 (1981).

Daniel Lazcano also argues the plea agreement hearing violated the appearance of

67

fairness doctrine and his due process rights because the trial court referred to Frank

Lazcano's testimony from Frank's own trial, which was not in the record in his case.

Lazcano argues that Frank's testimony from Frank's trial was part of the reason why the

trial court rejected the plea agreement.

The Code of Judicial Conduct (CJC) provides that a judge must disqualify himself

or herself "in any proceeding in which the judge's impartiality might reasonably be

questioned." CJC 2.11(A). This includes when a judge has "a personal bias or prejudice

concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute

in the proceeding." CJC 2.11(A)(1). In determining whether recusal is warranted, actual

prejudice need not be proven. A mere suspicion of partiality may be enough. *Sherman v.

State*, 128 Wn.2d 164, 205, 905 P.2d 355 (1995). The question under the appearance of

fairness doctrine is whether a reasonably prudent, disinterested observer would conclude

that the parties received a fair, impartial, and neutral hearing. *State v. Gamble*, 168

Wn.2d 161, 187, 225 P.3d 973 (2010). To succeed in an appearance of fairness claim, a

party must show evidence of a judge's actual or potential bias. *State v. Gamble*, 168

Wn.2d at 187-88.

The trial court is presumed to have properly discharged its official duties without

bias or prejudice. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1

(2004). The party seeking to overcome that presumption must provide specific facts

establishing bias. *In re Personal Restraint of Davis*, 152 Wn.2d at 692. Judicial rulings

alone almost never constitute a valid showing of bias. *In re Personal Restraint of Davis*,

152 Wn.2d at 692.

Daniel Lazcano observes that the trial court, during the plea hearing, noted Frank's

testimony in Frank's trial, and the trial court concluded that Frank was not the shooter.

Lazcano argues these statements show bias or partiality. Lazcano argues the trial court

should have recused itself. We refuse to address the argument, however, because

Lazcano did not raise the claim below. RAP 2.5(a). We note that the trial court denied

the plea agreement principally for other reasons. Lazcano cites no authority for the

proposition that a trial court's prior knowledge of a case is an illegitimate basis on which

to base a decision. Lazcano cites CJC 2.6 cmt. 3, but this comment only encourages

judges to recuse when they obtain information during settlement discussions that could

influence their decision making during trial.

Daniel Lazcano argues that juror 2 engaged in misconduct when he attempted to

speak to the prosecutor and when he discussed the case with other jurors even after the

jury was instructed not to discuss the case. He contends the verdict was tainted by this

juror who refused to follow the court's instructions. This court reviews a trial court's

determination of whether to remove a juror for abuse of discretion. *State v. Hopkins*, 156

Wn. App. 468, 474, 232 P.3d 597 (2010).

Daniel Lazcano complains of juror 2's conduct in seeking to ask the prosecutor and bailiff a question and discussing the case with jurors before deliberations. We do not know what specific comments juror 2 uttered. The trial court took immediate action by reminding the jury panel at large not to discuss the case with anyone else. Defense counsel agreed the trial court's proposed action was an appropriate solution. Because Lazcano did not complain during trial, he may not raise this issue on appeal. RAP 2.5(a). He also invited any error by conceding to the trial court's suggestion.

Daniel Lazcano argues that the prosecutor relied on Lazcano's head nods during the station interview during the prosecution's closing argument obtained in violation of the Fifth Amendment. The trial court did not allow testimony of the head nods during the State's case in chief, but permitted the testimony as impeachment after Lazcano testified. The prosecution proposed an instruction limiting the jury's use of the head nods for impeachment purposes. Defense counsel agreed with the trial court that a limiting instruction would draw undue attention to the nods. Counsel did not object to the prosecution's comments, during closing argument, regarding Lazcano's head nods.

Admittedly the difference between use of Daniel Lazcano's nods in response to police questioning as impeachment evidence and substantive evidence of guilt is razor thin. Nevertheless, when a defendant does not object to prosecutorial misconduct, he must demonstrate that an instruction could not have cured the prejudice. The prosecutor

70

No. 32228-9-III
*State v. Lazcano*

proposed a limiting instruction. Daniel Lazcano refused one. He did not object to the prosecutor's comments during closing argument.

Daniel Lazcano also contends that his trial court counsel was ineffective for not agreeing to a limiting instruction. We reject this argument because his counsel's decision was a legitimate trial tactic.

Finally, Daniel Lazcano argues that cumulative error deprived him of the right to a fair trial. Because Lazcano's appellate counsel already addressed this issue in his opening brief and because Lazcano's statement of additional grounds unearths no further error, this court need not address the argument again.

CONCLUSION

We affirm Daniel Lazcano's conviction for first degree murder.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, C.J.

WE CONCUR:

Korsmo, J.

Lawrence-Berrey, J.

71